PHILLIP C. SAMOURIS, ESQ. (Bar No. 163303)
samouris@higgslaw.com
MICHAEL J. HOISINGTON, ESQ. (Bar No. 201679)
mhoisington@higgslaw.com
HIGGS FLETCHER & MACK LLP
401 West "A" Street, Suite 2600
San Diego, CA 92101-7913
TEL: 619.236.1551
FAX: 619.696.1410

Attorneys for Plaintiff
CannaVest Corporation

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CannaVest Corporation, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>Kannaway, LLC, a Nevada limited liability company; General Hemp, LLC, a Delaware limited liability company, HDDC Holdings, LLC, a Nevada limited liability company and DOES 1-20,<br><br>Defendant. | CASE NO. 14-CV-2160-CAB-BLM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>DATE:   February 12, 2015<br>TIME:   2:00 p.m.<br>CRTRM: 4C<br>JUDGE:  Hon. Cathy Ann Bencivengo<br><br>CASE FILED: 9/11/14 |

Plaintiff CannaVest Corporation ("CannaVest" or "Plaintiff") respectfully requests that the Court issue a Preliminary Injunction against defendant Kannaway, LLC ("Kannaway"), enjoining Kannaway from continuing to offer products containing the mark CANNABIS BEAUTY® or any confusingly similar mark.

/ / /

/ / /

/ / /

/ / /

/ / /

---

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

3066496.1

14-CV-2160-CAB-BLM

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................2

II. FACTUAL BACKGROUND..................................................................................3

    A. Plaintiff Has Superior Rights In CANNABIS BEAUTY® ..................3

    B. Kannaway Solicits Plaintiff For A Trademark License .......................4

    C. During The Negotiation of the License Agreement, Plaintiff Rebuffs Kannaway for Improperly Attempting to Register Plaintiff's Trademarks and Takes Other Steps to Prevent Confusion..................................................................................................4

    D. Kannaway Improperly Offers Competing Products Under the Name CANNABIS BEAUTY ®..........................................................5

    E. CannaVest Demands That Kannaway Cease Using The CANNABIS BEAUTY® Mark.............................................................5

    F. Plaintiff Will Suffer Irreparable Harm If Kannaway Is Allowed To Continue To Use The CANNABIS BEAUTY® Mark ...................6

III. LEGAL STANDARD.............................................................................................8

IV. DISCUSSION........................................................................................................8

    A. Plaintiff Is Likely to Succeed On The Merits Of Its Trademark Infringement Claim ................................................................................8

        1. Plaintiff Has A Protectable Ownership Interest in the CANNABIS BEAUTY® mark.......................................................9

        2. Kannaway's Use Of The Mark Has Caused Confusion and Will Likely Continue to Cause Confusion..........................10

        3. Kannaway's Reliance On The Purported Licensing Agreement Is Misplaced ................................................................13

    B. Plaintiff Will Likely Suffer Irreparable Harm........................................15

    C. The Balance Of Equities Clearly Favors Plaintiff.................................16

    D. The Grant Of An Injunction Is In The Public Interest .........................17

V. CONCLUSION......................................................................................................17

HIGGS FLETCHER & MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

i

14-CV-2160-CAB-BLM

# TABLE OF AUTHORITIES

Page

**Cases**

*Alliance For The Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .................................................................. 8

*AMF, Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) .................................................................. 10

*Brookfield Commc'ns., Inc. v. West Coast Entertainment Corp.,*
174 F.3d 1036 (9th Cir. 1999) .......................................................... 10, 12

*Chance v. Pac-Tel Teletrac,*
242 F.3d 1151 (9th Cir. 2001) .................................................................. 9

*Charles Schwab & Co. Inc. v. The Hibernia Bank,*
665 F.Supp. 800; 3 USPQ2d 1561 (N.D. Cal. 1987) ............................. 11

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992) ................................................................ 12

*Goto.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000) ................................................................ 10

*Hydro-Dynamics, Inc. v. George Putnam & Co.,*
811 F.2d 1470 (Fed.Cir.1987) .................................................................. 9

*In re Shutts,*
217 USPQ 363 (TTAB 1983) ................................................................ 11

*In re Tennis in the Round Inc.,*
199 USPQ 496 (TTAB 1978) ................................................................ 11

*In re Vienna Sausage Mfg. Co.,*
156 USPQ 155 (TTAB 1967) ................................................................ 11

*Network Automation, Inc. v. Adv. Sys. Concepts, Inc.,*
638 F.3d 1137 (9th Cir. 2011) ......................................................  8, 9, 11

*Novartis Consumer Health, Inc. v.*
*Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,*
290 F.3d 578 (3rd Cir. 2002) .................................................................. 17

*Official Airlines Guides, Inc. v. Goss,*
6 F.3d 1385 (9th Cir. 1993 ..................................................................... 12

*Sengoku Works v. RMC Int'l,*
96 F.3d 1217 (9th Cir. 1996) .................................................................... 8

*Ultrapure Sys. v. Ham-Let Group,*
921 F. Supp. 659 (D. Cal. 1995) ............................................................ 14

# TABLE OF AUTHORITIES
## (continued)

Page

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7, 129 S. Ct. 365 (2008) .................................................................. 8, 10

**Statutes**

15 U.S.C. §1060 ............................................................................................... 15

15 U.S.C. § 1114 (Lanham Act) ......................................................................... 8

15 U.S.C. § 1127 ................................................................................................ 8

HIGGS FLETCHER &
MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

iii

14-CV-2160-CAB-BLM

## I. INTRODUCTION

CannaVest manufactures and sells a hemp-based line of personal care products (shampoo, conditioner, body wash, body lotion, hand cream and salve) under the brand name CANNABIS BEAUTY® – a mark it owns and which the United States Patent and Trademark Office ("USPTO") has registered (Reg. No. 4615445) and placed on the Supplemental Register (the "CANNABIS BEAUTY®" mark.) CannaVest has continuously sold this line of products and promoted it in advertising throughout the United States since September 2013. Based on the foregoing, these marks have acquired "secondary meaning" – consumers associate the mark with a particular source of personal care products.

Well after Plaintiff had commenced selling its CANNABIS BEAUTY® line of products, Kannaway, a multi-level marketing organization, solicited CannaVest for a license of the CANNABIS BEAUTY® mark which Kannaway later refused to sign. Despite the foregoing, Kannaway started to sell personal care products bearing the name CANNABIS BEAUTY DEFINED—the exact same mark as Plaintiff with the word "defined" added at the end. Clearly, Kannaway adopted this identical mark with full knowledge of CannaVest's superior rights in the mark and with the intent to confuse the public and to trade on CannaVest's goodwill.

Kannaway's infringing use of the CANNABIS BEAUTY® mark is irreparably harming CannaVest's reputation and goodwill. Consumers and resellers have publicly asserted that Kannaway's multi-level marketing organization is a scam or Ponzi scheme. Indeed, Kannaway's primary promoter and control person, Michael Llamas, is currently the target of a criminal indictment for mail and wire fraud in the Eastern District of California in connection with a scam to defraud mortgage lenders. In light of the foregoing, a preliminary injunction is necessary to protect CannaVest's goodwill and reputation from being irreparably harmed. Indeed, the record will show that consumers are likely to be confused and have in fact already been confused as to a supposed connection between CannaVest and

Kannaway, including specifically its line of personal care products. Based on the foregoing, CannaVest respectfully requests that the Court grant this motion and order Kannaway to immediately cease using the CANNABIS BEAUTY® mark.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff Has Superior Rights In CANNABIS BEAUTY®.

CannaVest launched its line of personal care products in **September of 2013**, all of which bear the CANNABIS BEAUTY® mark. **Exhibit A**[1] hereto is a copy of the original catalog for this line. Since then, these products have been sold in stores throughout the U.S. and on many internet websites and have been promoted in magazines, the internet, numerous trade shows and other marketing material. **Exhibits B and C** are true and correct copies of advertisements for these products. These products were displayed at the Natural Products Expo East show in Baltimore, September 25-28, 2013, and have been promoted at numerous trade shows since then. **Exhibit D** are photos of these products on display at trade shows. **Exhibit E** are close up photos of these products. See accompanying declaration of Plaintiff's CEO, Michael Mona, Jr. ("Mona, Jr. Decl."), ¶ 2; and accompanying declaration of Chris Boucher, ¶ 2 ("Boucher Decl.").

Plaintiff is the owner of a trademark registration with the USPTO for CANNABIS BEAUTY® (Reg. No. 4615445), which has been placed on the Supplemental Register. **Exhibit F** is a true and correct copy of a status page from the USPTO website reflecting the status of this trademark and asserting a first use in commerce of September 20, 2013.

### B.     Kannaway Solicits Plaintiff For A Trademark License.

In approximately January or February of 2014, the principals of CannaVest's former, exclusive online distributor, HempMeds PX, LLC ("HempMeds")[2],

---

[1] Unless otherwise indicated, all exhibits referenced herein are attached hereto.
[2] HempMeds breached its distributorship agreement with CannaVest in numerous material ways, causing CannaVest to terminate the agreement on or about August 11, 2014.

Michael Llamas and Troy Nihart, advised CannaVest's president and CEO, Mr. Mona, Jr., that HempMeds planned to launch a multi-level marketing organization under the name Kannaway to promote and sell hemp-based products, including CannaVest's products, and asked Mr. Mona, Jr. if CannaVest would license its CANNABIS BEAUTY® mark to Kannaway. (As distributors of CannaVest's products, these individuals were very familiar with CannaVest's trademarks, including its CANNABIS BEAUTY® mark.) Mr. Llamas and Mr. Mona, Jr. obtained a draft license agreement of the CANNABIS BEAUTY® mark from a San Diego attorney in March of 2014, which required Kannaway to source all hemp-based products from CannaVest (either directly or through HempMeds) and to comply with Plaintiff's "standards and specifications for goods and services… to protect the value, goodwill and integrity of the Marks…." See Section 3.1 (a) and (c) of the draft license agreement, **Exhibit G**, p. 39; and Mona, Jr., Decl., ¶¶ 3-4.

### C. During The Negotiation of the License Agreement, Plaintiff Rebuffs Kannaway for Improperly Attempting to Register Plaintiff's Trademarks and Takes Other Steps to Prevent Confusion.

During the negotiation of the license agreement, Kannaway circulated an email, promoting the creation of Kannaway as a new multi-level marketing arm of HempMeds—Plaintiff's distributor. (**Exhibit K**.) Plaintiff's customers and other individuals in the industry told Plaintiff that they thought Kannaway was affiliated with Plaintiff. In response, Plaintiff issued a press release, clarifying that there was no relationship between the parties. (**Exhibit L, p.59**.) Mona, Jr., Decl., ¶ 5.

At the same time, CannaVest discovered that Mr. Llamas had caused another entity that he controls, defendant HDDC Holdings, LLC ("HDDC"), to file trademark applications on trademarks that were currently being used by CannaVest, including an application for CANNABIS BEAUTY DEFINED, which includes the entirety of plaintiff's CANNABIS BEAUTY® Mark with the word "defined"

added at the end. (**Exhibit M**.) Mr. Mona complained to Mr. Llamas regarding these trademark applications, pointing out that the trademarks were already being used by CannaVest, and that CannaVest had superior rights in all of the marks. In response, Mr. Llamas assigned the trademark applications to CannaVest. **Exhibit N** is a true and correct copy of the assignment agreement (the "HDDC Assignment"). Mona, Jr., Decl., ¶ 6.

### D. Kannaway Improperly Offers Competing Products Under the Name CANNABIS BEAUTY ®.

Unbeknownst to Plaintiff, and despite the fact that the parties had still not come to an agreement on a trademark license, Kannaway improperly proceeded to offer a salve under the name CANNABIS BEAUTY DEFINED sometime after **March 1, 2014**, and later started selling other personal care products under that name. (**Exhibit O**.) (Boucher Decl., ¶ 3.) Plaintiff's CANNABIS BEAUTY® products and Kannaway's CANNABIS BEAUTY DEFINED products are sold through the same channels of commerce and are often promoted at the same trade show booths and on the same websites, side by side. (Mona, Jr., Decl., ¶ 7; and accompanying declaration of Plaintiff's sales representative, Matthew Markley, ¶ 1 ("Markley Decl.").) For example, **Exhibit P** are excerpts of a third party web site (www.CBDStore.co), offering the offending CANNABIS BEAUTY DEFINED personal care products and Plaintiff's CANNABIS BEAUTY® products, side by side. **Exhibit Q** is a photo of Kannaway's offending CANNABIS BEAUTY DEFINED products and Plaintiff's CANNABIS BEAUTY® products being promoted, side by side, at a trade show.

### E. CannaVest Demands That Kannaway Cease Using The CANNABIS BEAUTY® Mark. In Response, Kannaway Produces A Sham Exclusive Licensing Agreement Signed By Mr. Llamas.

On July 30, 2014, CannaVest sent a cease and desist letter to Kannaway, demanding that it cease using the CANNABIS BEAUTY ® mark. (**Exhibit R**.)

Kannaway did not respond to this letter. Thereafter, CannaVest sent another cease and desist letter on August 18, 2014. (**Exhibit S.**) (Mona, Jr., Decl., ¶ 8.) In response, Kannaway claimed that HDDC (the LLC discussed above which is also controlled by Mr. Llamas) had granted an exclusive license to Kannaway and defendant General Hemp, LLC ("General Hemp")—the parent company of Kannaway and HDDC—to use the mark CANNABIS BEAUTY DEFINED for 25 years with five- 5 year option periods for potential duration of 50 years (the "Purported License Agreement," **Exhibit T.**) (Mona, Jr., Decl., ¶ 8.) This agreement was allegedly created on February 27, 2014 or about two weeks before HDDC assigned the trademark application for CANNABIS BEAUTY DEFINED to CannaVest. (**Exhibit N.**) The Purported Licensing Agreement was signed by Mr. Llamas on behalf of the supposed licensor (HDDC) and one of the supposed licensees (General Hemp).

CannaVest had no knowledge of the Purported Licensing Agreement—defendants made no mention of it prior to receiving CannaVest's cease and desist letters. Moreover, Kannaway has never challenged CannaVest's rights to use the mark CANNABIS BEAUTY ® and has never attempted to abide by the Purported Licensing Agreement or to enforce it in anyway. (Mona, Jr., Decl., ¶ 9.)

### F. Plaintiff Will Suffer Irreparable Harm If Kannaway Is Allowed To Continue To Use The CANNABIS BEAUTY® Mark.

Kannaway knowingly copied the entirety of Plaintiff's CANNABIS BEAUTY ® mark to improperly trade on Plaintiff's goodwill and reputation. Kannaway's promoters, namely Llamas and Nihart, were distributors of CannaVest's products and were very familiar with CannaVest's trademarks, including its CANNABIS BEAUTY® mark. Indeed, they had asked Plaintiff to license the trademark to Kannaway and had entered into negotiations for the trademark license. (Mona, Jr., Decl., ¶¶ 3-4; and Boucher Decl., ¶ 3.)

Moreover, the record shows that Customers and other individuals in the

hemp-based product industry mistakenly believe that Kannaway is affiliated with Plaintiff and that Kannaway's CANNABIS BEAUTY DEFINED beauty products are produced or sponsored by CannaVest. (Mona, Jr., Decl., ¶ 10; and Markley Decl., ¶ 3.) Such individuals have also told officers of CannaVest that Kannaway's multi-level marketing organization is a Ponzi scheme and have expressed those concerns over the internet in various websites which evaluate multi-level marketing organizations and monitor the hemp-based product industry. (Mona, Jr., Decl., ¶ 12; and Markley Decl., ¶ 4.) (**Exhibit U** are true and correct copies of web pages wherein members of the public have voiced these concerns.)

In addition, Kannaway's founder, Mr. Llamas, has been indicted for mail and wire fraud in connection with a mortgage fraud scheme in the Eastern District of California, Case No. 2:12-CR-315-JAM (the "Llamas indictment"). (**Exhibit V** is a copy of the Superseding Indictment against Mr. Llamas.) In that Superseding Indictment, the U.S. Attorney alleges that Mr. Llamas arranged that purchase contracts, loan applications, and HUD-1 settlement statements be provided to lenders which falsely represented that borrowers would be making down payments, and that through a "series of sham financial transactions" the indicted defendants, including Mr. Llamas, "deceptively made it appear that the nominee buyers had made a genuine down payment from their own funds when, in fact, the buyers made no genuine down payment." (**Exhibit V**, ¶ 16, p. 153, lines 14-24.) The U.S. attorney further alleges that Mr. Llamas caused the recordation of false deeds of trust for a fictitious debt. (**Exhibit V**, ¶21, p. 155, lines 19-23.)

Kannaway continues to sell personal care products under the name CANNABIS BEAUTY DEFINED– products that directly compete with CannaVest's products. CannaVest has no ability to control the quality of those products. The products are sold through the same channels of commerce and are often on the same websites, side by side. Based on the foregoing, Plaintiff will suffer irreparable harm to its goodwill and reputation if Kannaway is allowed to

continue to market products under the CANNABIS BEAUTY ® mark. (Mona, Jr., Decl., ¶¶ 10-12; and Markley Decl., ¶¶3-4.)

## III. LEGAL STANDARD

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008). The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As discussed below, Plaintiff has satisfied each of these elements here.

## IV. DISCUSSION

### A. Plaintiff Is Likely to Succeed On The Merits Of Its Trademark Infringement Claim

A trademark is "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods." 15 U.S.C. § 1127. "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" *Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

#### 1. Plaintiff Has A Protectable Ownership Interest in the CANNABIS BEAUTY® mark

Ownership interests in a trademark accrue to the first party to actually use the mark in commerce. See *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996). "[O]wnership of a mark requires both appropriation and use in trade; and [ ]ownership of a mark and the exclusive right to a mark belongs to the one who first

uses the mark on goods placed on the market." *Chance v. Pac-Tel Teletrac*, 242 F.3d 1151, 1157 (9th Cir.2001) (internal quotation marks omitted and alteration in original). While the first use need not be extensive, the use must be bona fide and commercial in character:

> "[A] single sale or shipment may be sufficient to support an application to register the mark, providing that this shipment or sale has the color of a bona fide transaction and is accompanied or followed by activities which would tend to indicate a continuing effort or intent to continue such use and place the product on the market on a commercial scale within a time demonstrated to be reasonable in the particular trade."

*Id.* (citing *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1472-74 (Fed.Cir.1987)).

Here, Plaintiff launched its CANNABIS BEAUTY ® line of personal care products in **September of 2013** and has continuously sold this line of products in retail stores throughout the United States and on internet websites since then. (Mona, Jr. Decl., ¶ 2; and Boucher Decl., ¶ 2.) In contrast, Kannaway did not commence sales until after March 1, 2014, well after Plaintiff commenced sales of its CANNABIS BEAUTY ® products in September 2013. (Boucher Decl., ¶ 3.) Indeed, Kannaway's promoter, Mr. Llamas, solicited Plaintiff for a trademark license of the mark before Kannaway commenced sales. Clearly, Plaintiff was the first to use the CANNABIS BEAUTY ® mark in commerce and thus owns it.

### 2. Kannaway's Use Of The Mark Has Caused Confusion and Will Likely Continue to Cause Confusion

The Ninth Circuit employs a flexible multi-factor test to gauge the likelihood of confusion caused by an allegedly infringing mark. See *Network Automation, Inc.*, 638 F.3d at 1145. Normally, eight different factors are considered: similarity of the conflicting designations; relatedness or proximity of the two companies'

products or services; strength of the plaintiff's mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; the defendant's intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines. *Brookfield Commc'ns., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1053-54 (9th Cir. 1999); accord *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The list is not exhaustive, no factors are dispositive, and the relative importance of each factor will vary from case to case. See *Brookfield Commc'ns., Inc.*, 174 F.3d at 1054. As discussed in the following sections, an application of the *Sleekcraft* factors in this case shows that Kannaway's use of the CANNABIS BEAUTY® name is likely to cause confusion for consumers. Indeed, it already has caused confusion.

      a.    <u>Similarity of the Marks</u>

"[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Brookfield Commc'ns., Inc.*, 174 F.3d 1054-55. Moreover, "similarities are weighed more heavily than differences." *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (abrogated on other grounds by *Winter*, 555 U.S. 22). Here, Kannaway has adopted the entirety of Plaintiff's CANNABIS BEAUTY ® mark – all Kannaway has done is add the word "Defined" at the end of the mark. This factor overwhelmingly favors a finding of likelihood of confusion.

      b.    <u>Relatedness or Proximity of the Products</u>

Plaintiff's CANNABIS BEAUTY® products and Kannaway's CANNABIS BEAUTY DEFINED products are sold through the same channels of commerce and are often promoted at the same trade show booths and on the same websites, side by side. (Mona, Jr., Decl., ¶ 7; and Markley Decl., ¶ 1.) For example, **Exhibit P** are excerpts of a third party web site (www.CBDStore.co), offering the offending CANNABIS BEAUTY DEFINED personal care products and Plaintiff's CANNABIS BEAUTY® products, side by side. **Exhibit Q** is a photo of

Kannaway's offending CANNABIS BEAUTY DEFINED products and Plaintiff's CANNABIS BEAUTY® products being promoted, side by side, at a trade show. This factor also favors a finding of likelihood of confusion.

        c.     <u>Strength of Plaintiff's Mark</u>

At the preliminary injunction stage, mark strength is normally gaged by its conceptual strength. *Network Automation, Inc.* 638 F.3d 1149-50. "[C]onceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Id.* 1149. Marks are often ranked "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.) *Id.*

Plaintiff's CANNABIS BEAUTY ® is suggestive and inherently distinctive given the incongruous association of the two words – Cannabis + Beauty. Incongruity is a strong indication that a mark is suggestive rather than merely descriptive. *In re Tennis in the Round Inc.*, 199 USPQ 496, 498 (TTAB 1978). The Trademark Trial and Appeal Board has described incongruity in a mark as "one of the accepted guideposts in the evolved set of legal principles for discriminating the suggestive from the descriptive mark," and has noted that the concept of mere descriptiveness "should not penalize coinage of hitherto unused and somewhat incongruous word combinations whose import would not be grasped without some measure of imagination and 'mental pause.'" *In re Shutts*, 217 USPQ 363, 364–5 (TTAB 1983) (SNO-RAKE held not merely descriptive of a snow-removal hand tool); *see also In re Vienna Sausage Mfg. Co.*, 156 USPQ 155, 156 (TTAB 1967) (FRANKWURST held not merely descriptive for wieners, the Board finding that although "frank" may be synonymous with "wiener," and "wurst" is synonymous with "sausage," the combination of the terms is incongruous and results in a mark that is no more than suggestive of the nature of the goods). *See also, Charles Schwab & Co. Inc. v. The Hibernia Bank*, 665 F.Supp. 800, 806; 3 USPQ2d 1561 (N.D. Cal. 1987). Similarly, Plaintiff's CANNABIS BEAUTY ® mark is made up

of the terms "cannabis" being synonymous with hemp and "beauty" relating to something that pleases the aesthetic senses, especially the sight. (See Oxford Dictionary definitions, attached hereto as **Exhibit W**.) This factor also favors a finding of likelihood of confusion.

    d. <u>Marketing Channels Used By The Parties</u>

Again, both Plaintiff and Kannaway sell their products online, and promote them at the same trade shows. This factor also favors a finding of likelihood of confusion.

    e. <u>Degree of Care Used By Consumers</u>

Reasonably prudent consumers are expected to be more discerning – and less easily confused – when they are purchasing expensive items. Conversely, when purchasing inexpensive items, the reasonably prudent consumer is presumed to be less discerning and thus more easily confused. See *Brookfield*, 174 F.3d 1060. The products here are relatively inexpensive consumer products, such that consumers may not be discerning and thus more easily confused. This factor also favors a finding of likelihood of confusion.

    f. <u>Kannaway's Intent In Selecting The Mark</u>

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airlines Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). Moreover, if a plaintiff can prove intent, she is likely to prevail because the courts then presume that the public will be deceived. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992). In this case, Kannaway knowingly copied the entirety of Plaintiff's CANNABIS BEAUTY ® mark to improperly trade on Plaintiff's goodwill and reputation. Kannaway's promoters, namely Llamas and Nihart, were distributors of CannaVest's products and were very familiar with CannaVest's trademarks, including its CANNABIS BEAUTY® mark. Indeed, they had asked Plaintiff to license the trademark to Kannaway and had entered into negotiations for the

trademark license. (Mona, Jr., Decl., ¶¶ 3-4; and Boucher Decl., ¶ 3.) Moreover, the marks are identical. Based on the foregoing, the presumption of intentional deception to the public clearly should be enforced. This factor overwhelmingly favors a finding of likelihood of confusion.

     g. Evidence of Actual Confusion

The record shows that Customers and other individuals in the hemp-based product industry mistakenly believe that Kannaway is affiliated with Plaintiff and that Kannaway's CANNABIS BEAUTY DEFINED beauty products are produced or sponsored by CannaVest. (Mona, Jr., Decl., ¶ 10; and Markley Decl., ¶ 3.) Moreover, Kannaway has done absolutely nothing to mitigate this confusion. Rather, it intentionally adopted Plaintiff's mark and is marketing and promoting its products with the intent to create such confusion.

     h. Likelihood of Expansion and Product Lines

"The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." *Brookfield*, 174 F.3d 1060. Here, the parties are presently in direct competition with each other in the hemp-based consumer products space. Thus, this element is unimportant here.

Based on the foregoing, Plaintiff submits that Kannaway's use of CANNABIS BEAUTY DEFINED has caused consumer confusion and will continue to do so.

    3. Kannaway's Reliance On The Purported Licensing Agreement
      Is Misplaced

Kannaway will mistakenly assert that it supposedly has the right to use the CANNABIS BEAUTY DEFINED mark by virtue of the Purported Licensing Agreement that it recently produced in response to Plaintiff's cease and desist letters. (**Exhibit T**.) Kannaway's reliance upon this Purported Licensing Agreement is totally misplaced for several reasons, as discussed below.

First, at the time of the Purported Licensing Agreement in February of 2014,

HDDC had no trademark rights in the CANNABIS BEAUTY® mark and thus had nothing to license to Kannaway. Plaintiff was already using that mark and thus had superior rights in it. HDDC and Kannaway had not commenced any sales under that name. Moreover, HDDC's disingenuous attempt to submit a trademark application for the exact same mark – by simply adding the word "defined" to the mark – was totally without any legal basis. Simply put, CannaVest was the senior user with superior rights in the mark, while HDDC had no such rights to license to Kannaway as a matter of law.

Second, HDDC assigned ownership of the trademark application to Plaintiff here, such that Plaintiff is the owner of the mark at this time and, as the owner, it never agreed to any license agreement with Kannaway. Given that the Purported Licensing Agreement is for the ***exclusive*** use of the mark for ***fifty (50) years***, it is tantamount to a trademark assignment. HDDC purportedly granted Kannaway an exclusive license to the trademarks and withheld nothing for itself. Furthermore, although HDDC retained the right to assign the trademarks and the Purported License Agreement, all terms of the license were binding on any assignee. Importantly, although the purported license requires that HDDC pay for the prosecution of the trademark applications and for prosecuting any infringers, it places no restrictions on Kannaway's right to enforce the trademarks – HDDC did not retain the exclusive right to prosecute infringements nor did it require any notice from Kannaway of infringements. Kannaway, as the exclusive licensee, coupled with a property interest, qualifies as an assignee of HDDC. *See, e.g., Ultrapure Sys. v. Ham-Let Group*, 921 F. Supp. 659, 665-666 (D. Cal. 1995) (finding property interests were transferred to licensee that amounted to an assignment where the contract in fact bestowed exclusive use of the trademarks and did not set forth any restrictions on the licensee's ability to enforce the trademarks). As such, and assuming, *arguendo*, HDDC had any trademark rights to transfer, Kannaway's failure to record the Purported Licensing Agreement with the USPTO

means that it is void as against a subsequent purchaser for value without notice. *See* 15 U.S.C. §1060(a)(4)("An assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within three months after the date of the assignment or prior to the subsequent purchase.") Here, Plaintiff is a subsequent purchaser for consideration who expressly relied upon the assignment and did not have notice of the Purported Licensing Agreement. Thus, the Purported Licensing Agreement has no force and effect as against Plaintiff as a matter of law.

Finally, the Purported License Agreement lacks foundation – Defendants will not be able to provide a witness to authenticate it as a genuine agreement. Indeed, the totality of the circumstances clearly show that it is likely a sham that was created only recently in response to Plaintiff's cease and desist letters and thus should be given little or no weight. If Kannaway had an Exclusive Licensing Agreement since February of 2014, then why did Kannaway's management continue to negotiate with Plaintiff over a licensing agreement for the trademark for months after that date? Why didn't Kannaway simply assert its rights under the Purported Licensing Agreement long ago? It should also be noted that the Purported Licensing Agreement was signed by Mr. Llamas, a person who is under indictment for mail and wire fraud, including specific allegations of preparing fraudulent documentation to provide to mortgage lenders and filing falsified documents in the public real estate records.

Based on the foregoing, Kannaway's reliance upon the Purported Licensing Agreement is totally without merit. It should be given no weight here.

**B.     Plaintiff Will Likely Suffer Irreparable Harm**

Kannaway knowingly copied the entirety of Plaintiff's CANNABIS BEAUTY ® mark to improperly trade on Plaintiff's goodwill. Customers and other individuals in the hemp-based product industry mistakenly believe that Kannaway

is affiliated with Plaintiff and that Kannaway's CANNABIS BEAUTY DEFINED beauty products are produced or sponsored by CannaVest. (Mona, Jr., Decl., ¶ 10; and Markley Decl., ¶ 3.) Such individuals have also told officers of CannaVest that Kannaway's multi-level marketing organization is a Ponzi scheme and have expressed those concerns over the internet in various websites which evaluate multi-level marketing organizations and monitor the hemp-based product industry. (Mona, Jr., Decl., ¶ 12; and Markley Decl., ¶ 4.) (**Exhibit U** are true and correct copies of web pages wherein members of the public have voiced these concerns.) In addition, Kannaway's founder, Mr. Llamas, has been indicted for mail and wire fraud in connection with a mortgage fraud scheme. (**Exhibit V.**)

Kannaway continues to sell personal care products under the name CANNABIS BEAUTY DEFINED– products that directly compete with CannaVest's products. CannaVest has no ability to control the quality of those products. The products are sold through the same channels of commerce as Plaintiff's products and are often on the same websites, side by side. Based on the foregoing, if Kannaway is allowed to continue to infringe on Plaintiff's trademark – a mark Plaintiff has been using extensively and continuously since September of 2013 – Plaintiff will suffer irreparable harm to its goodwill and reputation. Such harm cannot be remedied with monetary damages.

### C.   The Balance Of Equities Clearly Favors Plaintiff

Plaintiff has established a likelihood of success on the merits and irreparable harm. The record shows that Kannaway knowingly adopted the CANNABIS BEAUTY® mark which is identical to Plaintiff's mark with the intent to deceive the public. Indeed, Kannaway's officers solicited Plaintiff for a license of the trademark at issue before it launched its competing product using the identical, infringing mark while the parties were supposedly negotiating an agreement.

Moreover, Defendant will not suffer any real hardship if the injunction is issued. Rather, all Defendant will need to do is simply change the name of its

product or otherwise cease using the trademark at issue. Also, to the extent that Kannaway could potentially suffer some hardship, any such potential harm is discounted by the fact that Defendant brought the injury upon itself by intentionally adopting Plaintiff's mark in an improper attempt to confuse the public. See *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3rd Cir. 2002)

### D. The Grant Of An Injunction Is In The Public Interest

For the reasons set forth above, in particular to avoid further consumer confusion, the grant of a preliminary injunction here is in the public interest.

### V. CONCLUSION

Plaintiff respectfully requests that the Court enjoin Kannaway from continuing to offer products containing the mark CANNABIS BEAUTY ® or any confusingly similar mark.

Respectfully submitted,

DATED: December 24, 2014        HIGGS FLETCHER & MACK LLP

By: /s/Phillip C. Samouris
PHILLIP C. SAMOURIS, ESQ.
MICHAEL J. HOISINGTON, ESQ.
Attorneys for Plaintiff